IN THE CIRCUIT COURT OF THE SIXTH JUDICIAL
CIRCUIT IN AND FOR PASCO COUNTY, FLORIDA

TOMMY ELLISON, JENNIFER
ELLISON, and BROTHERS IN ARMS, LLC,

Plaintiffs,

VS. CASE NO. ____________________

BLUETRITON BRANDS, INC. d/b/a
PRIMO BRANDS,

Defendant.
______________________________

UNOFFICIAL DOCUMENT

**COMPLAINT**

COMES NOW, Plaintiffs, TOMMY ELLISON, JENNIFER ELLISON, and BROTHERS IN ARMS, LLC (collectively, "Plaintiffs"), by and through their undersigned counsel, and sue DEFENDANT, BLUETRITON BRANDS, INC. d/b/a PRIMO BRANDS (formerly known as Nestle Waters North America Inc. and Great Spring Waters of America, Inc.) ("Defendant" or "Bluetriton") and in support allege as follows:

**SUMMARY**

Bluetriton describes itself as striving to be a "good neighbor," but in reality, Bluetriton is ruthless and a nightmare to its neighbors. During expansion of its manufacturing facility in Zephyrhills, Florida, Bluetriton became aware of repeated issues and failures involving its construction activities, including the improper handling of Bluetriton's stormwater. Bluetriton's knowing actions repeatedly and negatively impacted Bluetriton's residential neighbors, including Plaintiffs. Rather than implement suggested necessary repairs or remedies or pause construction to avoid Bluetriton's further negative impacts to residential neighbors, Bluetriton recklessly forged

ahead, all in the name of corporate greed. Simply put, Bluetriton viewed the costs to remedy its known errors and failures as too expensive. Bluetriton's conduct in this regard effectively passed on the consequences and high price of Bluetriton's reckless behavior directly to Plaintiffs and its other residential neighbors. Bluetriton, in cutting corners and stubbornly refusing to timely address repeated and known failures, caused six (6) flooding events, including one event in which Mr. and Mrs. Ellison endured being personally impacted by Bluetriton's flood waters and narrowly escaping tragedy. Bluetriton caused life altering damages to Plaintiffs, including, but not limited to, destruction of Plaintiffs' homestead, livelihood, personal possessions, some of their animals, and caused severe emotional distress to Plaintiffs.

**PARTIES, JURISDICTION AND VENUE**

1. Plaintiffs, Tommy Ellison and Jennifer Ellison (the "Ellisons"), are residents of Pasco County, State of Florida and own real property located at 39012 Woodland Drive, Zephyrhills, Florida ("Ellison Property"), comprising approximately one acre of land. The Ellison Property is in flood zone X and is not in a flood zone.

2. Plaintiff, Brothers In Arms, LLC, is a Florida limited liability company with its principal address on the Ellison Property in Zephyrhills, Pasco County, Florida.

3. Defendant, Bluetriton Brands, Inc. is a foreign profit corporation authorized to conduct business in the State of Florida and operates a significant bottling plant and water sourcing operation in Zephyrhills, Pasco County, Florida. Bluetriton owns real property on and near Woodland Drive, including property that is adjacent to and in close proximity to the Ellison Property, that is the subject of this action.

UNOFFICIAL DOCUMENT

4. Jurisdiction is proper in this Court because the amounts in controversy exceed $50,000.

5. Venue is proper pursuant to Section 47.011, Florida Statutes because the cause of action accrued in Pasco County, Florida and the properties in litigation are located in Pasco County, Florida.

## FACTUAL BACKGROUND

6. The Ellisons purchased their homestead in 2005, more than twenty years ago.

7. The Ellisons started a business, Brothers in Arms, LLC, on their Property in 2018. Over the years, Plaintiffs worked diligently to grow its business, Brothers in Arms, LLC.

8. In or around 2023 and 2024, Brothers in Arms, LLC was starting to expand its customer base, acquiring many new customers, some significant in size, and increasing its revenues and customer goodwill.

9. To facilitate the expansion, Plaintiffs invested significant funds into new equipment for the operations of Brothers in Arms, LLC, including, but not limited to, purchasing an expensive laser machine and other related equipment and supplies.

10. In or around 2024, Bluetriton was contemplating expansion of its operations. The neighbors on Woodland Drive and Bluetriton held a community meeting at the Alice Hall Community Center. The meeting included the Bluetriton local plant manager, a construction manager, and a mediator to discuss community concerns about the expansion plans slated to begin in July 2024. The community expressed grave concerns about flooding to neighboring properties. Bluetriton assured and promised the community that flooding would not occur as a result of its construction activities and expansion plans.

UNOFFICIAL DOCUMENT

11. In or around July 9, 2024, the Ellisons signed a contract with a roofing contractor to have a new metal roof installed on the Ellison home. At or around the same time, wood and roofing materials were delivered and placed in the front yard for installation on the home on the Ellison Property.

**Flooding Event One**

12. In or around July 14 and 15, 2024, a rainstorm occurred during the night. The Ellisons awoke to almost their entire parcel of property covered in white-colored water. Bluetriton construction workers were all throughout the residential neighborhood. Approximately one-half foot to two feet of water inundated the Ellison Property, with the water depth varying based on the area of the property.

13. Water from the Bluetriton property entered into the Ellisons' attached garage and into their detached shop. In addition, water covered the Ellisons' drain field and septic tank.

14. The water from the Bluetriton facility that inundated the Ellison Property soaked the plywood for the Ellisons' new roof. The garage attached to the Ellison's home, which contained personal property and some property for the Ellisons' small business, Brothers in Arms, LLC, was filled with several inches of water. The detached shop, which is of block construction and contained personal and business property, had approximately three inches of water.

15. The Ellisons animals, including turkeys and chickens, were inundated in deep water.

16. The temporary onsite construction manager representing Bluetriton was present in the neighborhood, as well as representatives of Bluetriton contractors. Representatives of Bluetriton admitted to the Ellisons that "a levy broke" on the Bluetriton property, which caused the inundation of water onto the Ellisons' Property.

UNOFFICIAL DOCUMENT

17. Moreover, another representative of a Bluetriton subcontractor told the Ellisons that on or about July 12, 2024, a few days before the first flooding event, he warned Bluetriton management that Bluetriton's activities were going to create problems and damages for the Ellisons.

18. In order to try to preserve their personal property, the Ellisons and their neighbors took action to move property from the garage and shop floors to avoid continued submersion in the water trespassing from the Bluetriton property.

19. The Ellisons requested that Bluetriton have ServPro or some other water remediation company come to the Ellison Property to assist in remediating water damage. The Ellisons also expressed their concern to Bluetriton representatives for their septic system, business and personal property, animals, plants, fruit trees, landscaping, and the Ellisons' equipment in both the attached garage and the detached shop.

20. Following this first flooding event, Bluetriton representatives dispatched the Wesley Chapel ServPro to the Ellison Property. While at the Ellison Property, ServPro's large truck got stuck and caused large ruts in the Ellisons' yard because of the standing water that had trespassed from the Bluetriton facility. Bluetriton representatives promised the Ellisons that Bluetriton would repair the large ruts in the Ellisons' front yard. BlueTriton, however, was not true to their word and never made the promised repairs.

21. Notwithstanding the warning that its activities were causing harm and damage to the Ellisons, Bluetriton failed to take any actions to cure the cause of the July 2024 flooding event and to avoid future flooding events. Bluetriton's deliberate actions in this regard directly and proximately caused further flooding events and catastrophic damages to Plaintiffs.

UNOFFICIAL DOCUMENT

**Flood Event Two**

22. On or around early August, 2024, Bluetriton's failure to remediate known issues with its construction project and continued reckless construction activities caused additional water to flood the Ellison Property.

23. The Ellisons complained to the Southwest Florida Water Management District.

24. On or about August 9, 2024, the Ellisons met at their kitchen table with two management representatives of BlueTriton to discuss what could be done about BlueTritons' repeated flooding of the Ellisons' Property.

25. The Ellisons' expressed frustration with the lack of concern by BlueTriton regarding Bluetriton's ongoing, negative impacts to the Ellison Property, and Bluetriton's refusal to respond to the Ellisons' efforts to contact BlueTriton about a remediation plan and damages.

26. The BlueTriton management representatives brought aerial photographs of their facility and the neighborhood to explain what measures Bluetriton was contemplating to try to address flooding of the Ellisons' Property caused by Bluetriton.

27. One of the BlueTriton management representatives pointed out the Ellison Property on the aerial photograph, noting that most of the properties that surrounded the Ellisons' Property were owned by Blue Triton. The BlueTriton management representative then commented: "Don't think they own these properties for no reason."

28. The BlueTriton management representatives admitted to the Ellisons that they did not know if they could fix Bluetriton's engineering and construction failures.

29. The Bluetriton management representatives also told the Ellisons that Bluetriton was concerned that reengineering the project could potentially cause more problems for the Ellisons or be too expensive to fix. The Bluetriton management representatives then suggested

UNOFFICIAL DOCUMENT

having "property discussions," alluding to the fact that it might be more cost beneficial for Bluetriton to purchase the Ellison Property rather than reengineer the entire project.

30. One of the Bluetriton management representatives suggested that the Ellisons write two communications; one to discuss damages and compensation from flooding events one and two; and the second communication to the corporate offices of Bluetriton regarding recognition of Bluetriton's construction and engineering failures and its inability to prevent flooding from happening in the future. The Bluetriton management representatives said they would forward the Ellisons' communications to the corporate offices of Bluetriton.

31. On or about August 18, 2024, the Ellisons, as requested, emailed the two Bluetriton management representatives regarding damages and losses so they could forward those communications to the corporate offices of Bluetriton.

32. On or about August 20, 2024, a representative of the Southwest Florida Water Management District ("SWFL Water District") visited the Ellisons' Property.

33. The SWFL Water District representative and Mrs. Ellison walked the neighborhood and Mrs. Ellison showed the representative where the improper water shedding and flooding problem area originated, and how the water improperly flowed from Bluetriton's property to the Ellisons' Property. *See* Exhibit A (email to SW Florida Water Management District).

34. Bluetriton Tract 104, parcel 13-26-21-0070-07400-0000, had a holding pond that had a spillway on the east that overflowed into a low area into the construction access road, which ran parallel and south of the holding pond of tract 104, to the southside of another BlueTriton owned parcel.

35. Bluetriton's holding pond on tract 104 was insufficient and unable to contain excess water during rain events. The holding pond was constantly filled and then crested.

UNOFFICIAL DOCUMENT

36. Moreover, water from the holding pond was not flowing to other holding areas on Bluetriton's properties due to clogged pipes running under Bluetriton parking lots, according to statements made to the Ellisons by Bluetriton management representatives during the meeting at the Ellisons' kitchen table. These clogged pipes caused the water to spill over the spillway into the residential neighborhood and directly into the Ellisons' Property.

37. After flooding event two and before flooding event three, Bluetriton refused to implement immediate fixes to remediate the flooding of the Ellisons Property or pause its construction activities to minimize further harm to the Ellisons Property.

38. Rather than spend the money to fix its problems, even in the face of potentially ruining the Ellisons' Property and lives, Bluetriton elected to put only a small bandaid on a gushing wound. Bluetriton began using small pumps and hoses manned by temporary employees to try to move some excess water from the holding pond to other areas. Bluetriton's actions in this regard were reckless.

39. Moreover, Bluetriton did not have a permit from SWFL Water District to dewater its stormwater holding ponds. In fact, prior concerns had been expressed about improper dewatering by Bluetriton.

UNOFFICIAL DOCUMENT

**Flooding Event Three**

40. On September 4, 2024, the Ellisons' Property again was inundated with water from the Bluetriton construction activities. The Ellisons made multiple attempts to reach County and City representatives, as well as representatives of Bluetriton regarding this third flooding event.

41. The Ellisons finally received a message from Mr. Brendan O'Rourke, a manager at Bluetriton, even though they had emailed him weeks before on August 18, 2024.

42. On September 5, 2024, the Ellisons had a telephone call with Mr. O'Rourke. The Ellisons explained the history of the multiple flooding events caused by Bluetriton. The Ellisons further explained that Bluetriton had already had the Ellisons' septic pumped twice because of flood waters from the Bluetriton negligent construction activities.

43. Mr. O'Rourke admitted that Bluetriton's local engineer from the plant confirmed that the flooding on the Ellisons' property was caused by Bluetriton's construction activities and improper stormwater handling, and that Bluetriton was working with a team to come up with a "solution" to address Bluetriton's repeated flooding of the Ellisons' Property.

44. Mr. O'Rourke advised the Ellisons that it would take approximately two more weeks to come up with what he called a "solution" and then implementation of the solution would take even more time.

45. The Ellisons made Mr. O'Rourke aware that they were being proactive by installing sand bags to prevent further water intrusion and also were trying to remove as much excess water as possible in the garage and shop with wet vacuums.

46. Mr. O'Rourke told the Ellisons he thought the Ellisons had previously been compensated for prior floods one and two, but the Ellisons advised him that the only thing Bluetriton had done was call ServPro after the first flood and pump the Ellisons' septic tank twice after floods one and two.

47. The Ellisons provided Mr. O'Rourke specifics regarding their damages from the prior flooding events caused by Bluetriton and advised him that they had sent an email to Bluetriton Corporate after the kitchen table meeting with Bluetriton management representatives.

UNOFFICIAL DOCUMENT

48. The Ellisons expressed their concerns to Mr. O'Rourke that the ongoing issues with the negligent Bluetriton construction activities, if not quickly remediated, would continue to cause flooding of the Ellison Property and potentially impact the ability to sell their home in the future.

49. The Ellisons also told Mr. O'Rourke about their earlier kitchen table meeting with other Bluetriton management representatives and those representatives' concern that whatever Bluetriton tries to do to fix the ongoing issues may, in fact, cause further and more catastrophic problems for the Ellisons.

50. Mr. O'Rourke acknowledged that "no one is going to want to purchase a home that floods." Mr. O'Rourke committed to calling the Ellisons back with a solution.

51. Mr. O'Rourke said that Bluetriton's "commitment is that we are going to fix it, so that it doesn't flood your house because that's just the right thing to do."

52. Mr. O'Rourke acknowledged that the Ellisons' Property had been flooded by Bluetriton three times. He said that although Bluetriton knew that they could not fix the issue right away, Bluetriton nonetheless wanted to help. Mr. O'Rourke also told the Ellisons that Bluetriton was committed to compensating the Ellisons' for their losses – a commitment that Bluetriton failed to keep.

53. The Ellisons talked to Mr. O'Rourke again on September 6, 2024, almost two months after Bluetriton first flooded the Ellison Property. Mr. O'Rourke told the Ellisons that the engineering consultant still had not completed preparation of any recommended solutions to stop Bluetriton's repeated flooding of the Ellison Property and probably would not be done with its work until the end of September 2024. Mr. O'Rourke said he wanted to travel down to visit the Ellisons on October 8 or 9, 2024 to discuss the proposed solutions.

UNOFFICIAL DOCUMENT

54. Bluetriton took no action to try to accelerate identification or implementation of fixes to the repeated flooding of the Ellison Property and other neighboring properties. Rather, Bluetriton, a corporate behemoth with access to and the capability of creating expedited solutions, appeared to completely disregard its repeated negative impacts to its neighbors and the impending disaster to follow.

55. Mr. O'Rourke asked the Ellisons to call a water restoration company to assist them in trying to remediate the additional flooding and promised that Bluetriton would pay for those services. The Ellisons selected a water restoration company, but Bluetriton never paid the invoice.

**Flooding Event Four**

56. The Ellison Property was again inundated with water from the Bluetriton property on or about September 11, 2024. The flood waters from the prior event had barely or only partially receded before this fourth flooding event occurred.

57. At this point, Bluetriton was on notice of four flooding events. Notwithstanding, Bluetriton took no action to remedy the obvious construction and/or engineering failures that allowed Bluetriton to repeatedly flood the Ellison Property and other neighboring properties.

58. Shortly after this event, the Ellisons again called a representative of SWFL Water District about the fourth flooding event. SWFL Water District requested photographic evidence, which the Ellisons provided.

59. Shortly thereafter, a representative from Pasco County walked the Ellisons' Property with Mrs. Ellison. The Pasco County representative acknowledged the massive problem the Ellisons were facing from Bluetriton but claimed that the issue was complicated because the Ellisons were located in the County but the BlueTriton property causing the flooding of the Ellison Property was located in the City.

UNOFFICIAL DOCUMENT

**Flooding Event Five**

60. On September 13, 2024, the Ellisons Property incurred a fifth flooding event of their Property caused by Bluetriton's deliberate decision to continue its ongoing negligent construction and engineering activities with full knowledge that Bluetriton's activities were damaging the Ellison Property.

61. On September 19, 2024, the Ellisons sent an emotional plea to Mr. O'Rourke about flooding event five. Mr. O'Rourke acknowledged that he received the email but otherwise took no action to avoid future flooding or help the Ellisons.

62. Notwithstanding the crushing impacts Bluetriton was imposing upon the Ellisons and the Ellison Property, six days later, on September 25, 2024, the Ellisons found a letter with three cases of water on their front porch from a Bluetriton plant manager.

63. Bluetriton's actions in this regard demonstrated and were indicative of the complete lack of concern or care for the repeated and serious negative impacts Bluetriton was repeatedly wrecking on Ellisons' Property and livelihood.

64. On October 7, 2024, the Ellisons received an email from Mr. O'Rourke requesting a virtual meeting for October 8, 2024.

65. During the October 8, 2024, meeting, Mr. O'Rourke posed questions to the Ellisons about the cost for the Ellisons to purchase another home of equivalent value to their current home that would support the lifestyle that the Ellisons were living and that would support their business. The Ellisons told Mr. O'Rourke there were not many options, without living in an HOA community. The Ellisons then sent Mr. O'Rourke a summary of considerations for the Ellisons to move and the cost.

UNOFFICIAL DOCUMENT

**Flooding Event Six**

66. The very next day, on October 9, 2024, the Ellison Property was again flooded from the ongoing egregious activities and engineering failures on the Bluetriton Property.

67. The Zephyrhills Municipal Airport ("Airport") is located less than one mile (as the crow flies) from the Ellison Property. Hourly weather data collected from that Airport reflects that on October 9, 2024, from 1:35 a.m. until 2:35 p.m., there was only a total of 1.46" of reported precipitation. At 2:30 p.m. there was no standing water on the Ellisons Property.

68. On October 9, 2024, from 2:35 p.m. until 3:55 p.m., weather data from the Airport reflects that there was a total of 0.25" of reported additional precipitation.

69. Notwithstanding these rain measurements, by 4:00 p.m., Bluetriton's property across the street (tract 105) from the Ellison Property had already flooded and made its way across the road and started filling the Ellison Property. According to hourly rainfall measurements from 3:55 p.m. until 5:55 p.m., there was only a total of 0.27" of reported of additional precipitation.

70. At 6:20 p.m., the flood waters trespassing from the Bluetriton property were cresting the 4" sidewalk at the Ellisons' front porch. Hourly rainfall measures from the Airport reflect that from 5:55 p.m. until 7:15 p.m., there was a total of 0.07" of reported of additional precipitation.

71. By 7:20 p.m., the flood water from the Bluetriton property made its way through three layers of sandbags and started coming into the Ellisons' attached garage and office. The Ellisons started using three shop vacuums to remove water from the attached garage and dumping it out on the grass in their backyard, where there was no water standing at the time. The Ellisons maintained this effort until the power went out between 8:30 p.m. and 9:00 p.m.

UNOFFICIAL DOCUMENT

72. Weather data from the Airport reflects that hourly rainfall measurements on October 9, 2024, from 7:15 p.m. until 7:35 p.m., there was a total of 0.01" of reported additional precipitation.

73. By 7:45 p.m., the water trespass from the Bluetriton Property to the Ellison Property made its way through the multiple layers of sandbags on the front porch and was at the front and back doors. Weather data from the Airport reflects that from 7:35 p.m. until 8:15 p.m., there was a total of 0.03" of reported additional precipitation.

74. At around 8:15 p.m., flood waters from the Bluetriton property started coming through every entrance of the Ellisons' home and water exploded up through the Ellisons' toilets.

75. Weather data from the Airport reflects that from 8:15 p.m. until 9:35 p.m., there was a total of 0.03" of reported additional precipitation.

76. At 9:40 p.m., flood waters from Bluetriton was approximately 1" deep inside the Ellisons' whole home but was about knee deep outside the home.

77. By around 10:17 p.m., flood waters from BlueTriton were at a depth of approximately three (3) inches inside Ellisons' home and up to five (5) inches by 11:00 p.m.

78. At around 11:58 p.m., rainfall increased but by that time, the Ellisons home was already completely flooded by contaminated water from the Bluetriton property caused by its reckless and intentional conduct and engineering failures.

79. At around 12:56 a.m., the Ellisons' personal property and some of the furniture inside their home started to float. Ellisons became concerned for their safety because of the amount of contaminated water from the Bluetriton property that surrounded them within their home.

80. At 1:00 a.m., the Ellisons began their efforts to try to evacuate and escape the home, concerned that if the water rose any further in the interior of the home, the Ellisons would be

UNOFFICIAL DOCUMENT

unable to escape. The Ellisons gathered their dog and cat, a few personal items, and food for their animals. By this time, the water was up to the bottom of the Ellisons' kitchen counter tops and just inches from covering the door handle of their front door.

81. As the Ellisons drove north past the Bluetriton holding pond, they witnessed that the water held on tract 104 had crested and was overflowing the berm south towards the Ellisons Property. The Ellisons ended up sleeping in their truck at a local park, Krusen Field, across the street on the north side of Bluetriton plant.

82. At 4:30 a.m., the Ellisons looked up their address on a website that did not show any flood warnings for the Ellisons' address. The Ellisons Property is not in a flood zone.

83. At 7:30 a.m., the Ellisons left Krusen Field Park. The BlueTriton plant across the street from Krusen Field Park did not appear to have any standing water or water overflowing in the north retention pond, where the pipe goes under a parking lot from holding pond on tract 104. This is the same stormwater system that the BlueTriton management representatives during the kitchen table meeting had told the Ellisons was not functioning properly and had clogged pipes on the north side.

84. The holding pond on the south side of the Bluetriton property is one that collects the bulk of run-off and is bottlenecked into and expected to flow through an underground pipe underneath a large portion of Bluetriton's back parking lot to a very small holding pond and then it exits underneath Alston Avenue to a canal. The water in this canal is where Bluetriton's end-point of their holding ponds are emptied.

85. The Ellisons took pictures along the way back to their home showing there was no water on Alston Avenue or on 20th Street until the location near the construction access road on the south side of BlueTriton's holding pond on parcel 104.

UNOFFICIAL DOCUMENT

86. At 7:43 a.m. the Ellisons arrived back at their Property.

87. The private road between the Ellison Property and Bluetriton property was covered in water and the Ellison's almost acre of land was covered in three to four feet of water.

88. The water that covered 20th Street to the north of the Ellison Property began at Bluetriton's construction access road running south of Bluetriton's berm, filling tracts 103, 104, 105, 106, covering the east end of Woodland Drive to Camphorwood Drive, the Ellisons' Property and neighboring properties.

89. The Ellisons waded into their home to see if there were any clothing or other items above the water line that could be salvaged. The Ellisons lost their phones in the water during this salvage operation after a piece of furniture floating in the water flipped over.

90. Although Bluetriton has attempted to divert responsibility for its repeated, intentional and reckless conduct on a hurricane, the hurricane made landfall in Sarasota (Siesta Key), in Sarasota County Florida at 8:30 p.m. on October 9, 2024, which is three counties south of Pasco County. Moreover, the hurricane does not explain the five previous flooding events directly caused by Bluetriton or Bluetriton's improper and repeated dewatering operations.

91. The water that trespassed during the sixth flooding event on October 9, 2024 came from Bluetriton's holding pond as a result of unaddressed engineering and construction failures and was the direct and proximate result of the negligent and reckless actions of a poorly engineered expansion project at Bluetriton.

92. Bluetriton repeatedly ignored warnings of its hired contractors, subcontractors and others that there were material deficiencies in its construction and stormwater activities. Representatives of certain contractors and subcontractors made repeated attempts to convince

UNOFFICIAL DOCUMENT

Bluetriton to take remedial measures that would have the effect of mitigating and/or stopping the repeated trespasses and damages to the Ellisons caused by Bluetriton.

93. Notwithstanding, Bluetriton refused to fix its errors and deficiencies because Bluetriton did not want to pay the costs to fix those issues.

94. Instead, Bluetriton allowed its repeated, egregious and negligent conduct to continue to harm its residential neighbors. Bluetriton repeatedly and callously disregarded the devastation and damages its activities caused to the Ellisons. Upon information and belief, Bluetriton deliberately failed to remedy the repeated flooding events and ongoing negligent conduct because Bluetriton wanted to force the Ellisons into an acquisition of their homestead at distressed and deeply discounted prices.

95. On or about October 14, 2025, the Ellisons had another meeting with two Bluetriton management representatives. During this meeting, Bluetriton's representatives advised the Ellisons not to file an insurance claim for their home and personal property.

96. On or about October 18, 2025, pumping efforts by Bluetriton had finally removed enough water that the Ellisons were able to enter their detached shop to assess damages. The Ellisons were advised not to enter their home due to bacteria from the water that had entered from Bluetriton's property and the presence of mold.

97. The Ellisons had lived on the Property for almost twenty (20) years and accumulated a lifetime of possessions, including some that are irreplaceable.

98. The Ellisons lost everything, including, but not limited to, their homestead, their business, all of their personal property, and some of their deeply loved animals, all due to Bluetriton not wanting to spend a bit of money to fix its negligent and egregious errors.

UNOFFICIAL DOCUMENT

99. The Ellisons were relegated to living in a travel trailer and paying a mortgage on a home that was rendered unlivable by the repeated negligent and egregious actions by Bluetriton.

100. The Ellisons retained the services of the undersigned counsel and are required to pay a reasonable fee for services.

101. All conditions precedent to this action have been performed, taken or waived.

**COUNT I – NEGLIGENCE**

102. Plaintiffs reallege Paragraphs 1 through 101 above as if set forth fully herein.

103. This is an action for negligence against Defendant.

104. Defendant owed duties to the Ellisons to properly conduct its construction and engineering activities and to properly manage Bluetriton's stormwater.

105. Defendant repeatedly breached its duties and knowingly caused at least six flooding events to occur at the Ellison Property.

106. Defendant's actions were patently unreasonable, including Defendant's repeated refusal to try to fix known engineering and construction failures involving Bluetriton's stormwater systems.

107. Defendant's actions were the direct and proximate cause of injuries to Plaintiffs.

108. Plaintiffs incurred damages, including, but not limited to total loss of real and personal property, and lost profits, as a result of the Defendant's breaches of its duties to Plaintiffs.

WHEREFORE, Plaintiff respectfully request that the Court award Judgment against Defendant for Plaintiffs' damages, costs, pre and post judgment interest, and such other and further relief as the Court deems just and proper.

**COUNT II -- TRESPASS**

109. Plaintiffs reallege Paragraphs 1 through 101 above as if set forth fully herein.

UNOFFICIAL DOCUMENT

110. This is an action for trespass against Defendant.

111. Defendant willfully and repeatedly caused water from Defendant's property to enter Plaintiffs' property.

112. Defendant's actions were negligent as to the first flooding event but intentional for the five flooding events thereafter.

113. Plaintiffs' Property unlawfully entered by Defendant was owned by Plaintiffs and in Plaintiffs' possession.

114. The entry or intrusion by Defendant occurred without Plaintiffs' authorization, license or invitation.

115. Defendant's actions caused injuries to Plaintiffs' property, real and personal.

116. Because of the repeated intrusions by Defendant's onto Plaintiffs' property, the intrusions caused temporary and then permanent injuries to Plaintiffs.

WHEREFORE, Plaintiffs respectfully request that the Court award Judgment against Defendant for Plaintiffs' damages, costs, pre and post judgment interest, and such other and further relief as the Court deems just and proper.

UNOFFICIAL DOCUMENT

**COUNT III – NUISANCE**

117. Plaintiffs reallege Paragraphs 1 through 101 above as if set forth fully herein.

118. This is an action for nuisance against Defendant.

119. Defendant repeated reckless and intentional actions caused substantial interference with Plaintiffs' use and enjoyment of their property.

120. Defendant's interference in Plaintiffs' use and enjoyment of their property was substantial and unreasonable.

121. Defendant's interference resulted in actual, material, physical discomfort.

122. Defendant's repeated reckless and intentional actions and Defendant's property caused the interference of Plaintiffs' use and enjoyment of their property.

123. Plaintiffs suffered damages as a result of Defendant's actions, including, but not limited to, economic losses, diminution or near total loss in property value, great personal discomfort, inconvenience and annoyance.

WHEREFORE, Plaintiffs respectfully request that the Court award Judgment against Defendant for Plaintiffs' damages, costs, pre and post judgment interest, and such other and further relief as the Court deems just and proper.

**COUNT IV – NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**

124. Plaintiffs reallege Paragraphs 1 through 101 above as if set forth fully herein.

125. The Ellisons were directly impacted by flood waters emanating from the Bluetriton Property and its stormwater system during six flooding events, the last of which found the Ellisons personally submerged inside their home in multiple feet of bacteria-laden water emanating directly from the Bluetriton Property and its improperly engineered holding pond.

126. The physical contact or injury caused by the Bluetriton flood waters caused severe psychological trauma to the Ellisons.

127. Plaintiffs' emotional distress flowed directly from the physical impact caused by Bluetriton and the flooding the flooding events.

128. Plaintiffs suffered damages as a result of Defendant's actions, including, but not limited to, severe emotional distress, including hospitalization.

WHEREFORE, Plaintiffs respectfully request that the Court award Judgment against Defendant for Plaintiffs' damages, costs, pre and post judgment interest, and such other and further relief as the Court deems just and proper.

UNOFFICIAL DOCUMENT

**COUNT V – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

129. Plaintiffs reallege Paragraphs 1 through 101 above as if set forth fully herein.

130. This is an action for intentional infliction of emotional distress against Defendant.

131. Defendant's conduct was intentional and/or reckless and intended to cause emotional distress to Plaintiffs.

132. In the alternative, Defendant acted with reckless disregard of the likelihood that emotional distress would result to Plaintiffs.

133. Defendant's conduct was extreme and outrageous, went beyond all possible bounds of decency and was atrocious and utterly intolerable in a civilized community.

134. Defendant's conduct caused Plaintiffs' emotional distress.

135. Plaintiffs' emotional distress was severe and significantly impacted Plaintiffs.

WHEREFORE, Plaintiffs respectfully request that the Court award Judgment against Defendant for Plaintiffs' damages, attorneys' fees, costs, pre and post judgment interest, and such other and further relief as the Court deems just and proper.

**PLAINTIFFS DEMAND TRIAL BY JURY**

UNOFFICIAL DOCUMENT

**RESPECTFULLY SUBMITTED,** this the 29th day of June, 2026.

**MATTHEWS & MATTHEWS, LLP**

*/s/ Elizabeth Billhimer*
ELIZABETH BILLHIMER
Florida Bar No. 121986
4475 Legendary Drive
Destin, Florida 32541
Telephone: (850) 837-3662
Facsimile: (850) 654-1634
ebillhimer@destinlaw.com (primary)
astokes@destinlaw.com (secondary)
Attorney for Plaintiffs, Tommy Ellison, Jennifer Ellison, and Brothers in Arms, LLC

UNOFFICIAL DOCUMENT

**Rachel Gironella**

**From:** Jan Burke
**Sent:** Monday, November 25, 2024 1:07 PM
**To:** Carolyn Pina
**Cc:** Amber E. Smith; Rachel Gironella
**Subject:** FW: CT 434570 / 434017 Emergency Pumping ERP 3652.015 BlueTriton 20th St 4330 Zephyrhills (Pasco Co) Permit Forms [WaterMatters.org]

Carolyn, Please reach out to Mr. McConnell regarding the email trail below. Note that they currently have a permit modification that is under construction, so try to determine whether or not the proposed dewatering is related to the construction activities associated with the permit modification. Not sure where they want to dewater but the city has had past concerns with the dewatering going to their permitted pond. Please keep Rachel in the loop for training purposes, since she will probably be dealing with this in the future. Thanks, Jan

Jan R. Burke, P.E.
ERP Compliance Manager
Regulation Division
Southwest Florida Water Management District
170 Century Boulevard
Bartow, FL
(800)492-7862 or (863) 534-1448 x6103
Direct Line: (863) 345-1113
Jan.Burke@swfwmd.state.fl.us
WaterMatters.org/ePermitting

UNOFFICIAL DOCUMENT

---

**From:** Amber E. Smith <Amber.Smith@swfwmd.state.fl.us>
**Sent:** Thursday, November 21, 2024 4:22 PM
**To:** Jan Burke <Jan.Burke@swfwmd.state.fl.us>
**Subject:** FW: [WaterMatters.org] Emergency Pumping Permit Forms

Good afternoon Jan,

Blue Triton, (Zephyrhills water bottling), emailed to receive copies of the emergency pumping forms that they need to fill out. Would we be able to send to them?

Thank you,

Amber E. Smith
Government Affairs Regional Manager
Southwest Florida Water Management District (SWFWMD)
Office: (813) 467-7196
Cell: (813) 767-5306
Southwest Florida Water Management District



EXHIBIT A

**From:** Noreply WebNotifications <NRWM@swfwmd.onmicrosoft.com>
**Sent:** Thursday, November 21, 2024 3:50 PM
**To:** Amber E. Smith <Amber.Smith@swfwmd.state.fl.us>
**Subject:** [WaterMatters.org] Emergency Pumping Permit Forms

Hello Amber.Smith@swfwmd.state.fl.us, Leo Joseph McConnell (leo.mcconnell@bluetriton.com) has sent you a message via the Staff Search contact form at WaterMatters.org. Please handle this communication as you would any other unsolicited communication from a member of the public.
The sender's name
Leo Joseph McConnell
The sender's email
leo.mcconnell@bluetriton.com
Subject
Emergency Pumping Permit Forms
Message
Greetings Amber:
Your contact information was provided as follow up to a site visit made to the address below on 9/4.

4330 20th St, Zephyrhills, FL 33542

Mentioned was made that you referenced a standard permitting process (potentially an application) for the intended use of transfer pumping during significant storm events. Can you please share more on the process: application, documents, typical review/approval timeframe, etc.?

*I've been unsuccessful in finding relevant information via web search and your contact phone provided notes restrictions (813-836-0797)

Please feel free to contact me using the information below if easier to discuss.
Thank you in advance for your insight you can provide,

Leo McConnell | Engineering Design Manager
PRIMO Brands
Cell: (760) 835-2661
Email: leo.mcconnell@bluetriton.com

UNOFFICIAL DOCUMENT